IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| **TUCKER KARRH,** | § | |
| **GARY KARRH and SHARRA** | § | |
| **KARRH,** | § | |
| | § | |
| **V.** | § | **Civil Action No. _____** |
| | § | **JURY TRIAL** |
| **REMINGTON ARMS COMPANY,** | § | |
| **LLC, AND GANDER MOUNTAIN** | § | |
| **COMPANY** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

COMES NOW Plaintiffs Tucker Karrh, Gary Karrh and Sharra Karrh, and complain of Remington Arms Company, LLC ("Remington"), and Gander Mountain Company ("Gander Mountain"), and file their Original Complaint and for cause of action would show the Court and the jury the following:

### PARTIES

1.      Plaintiff Tucker Karrh, Gary Karrh and Sharra Karrh are and were at all material times, residents of Amarillo, Texas.

2.      Defendant Remington Arms Company, LLC was and is a limited liability company foreign to the State of Texas being organized and incorporated under the laws of the State of Delaware and having its principal place of business in North Carolina. At all times relevant to this action, Remington was doing business in the State of Texas by selling, manufacturing and distributing rifles through its distributors and sales force. Defendant Remington Arms Company, LLC may be served with process by serving its Registered Agent: CT Corporation System, 350 North St. Paul St., Ste. 2900, Dallas, TX 75201-4234.

3.     Defendant Gander Mountain Company is a corporation foreign to the State of Texas being organized and incorporated under the laws of the State of Minnesota, having its principal place of business in St. Paul, Minnesota.  At all times relevant to this action, Gander Mountain was doing business in the State of Texas by selling and distributing rifles manufactured by Remington. Defendant Gander Mountain Company may be served by serving its Registered Agent CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, TX 75201-4234.

## JURISDICTION AND VENUE

4.     The jurisdiction of this Court attaches under the provisions of 28 USC § 1332, in that the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000, and the parties are citizens of Texas.  Federal court jurisdiction is based on diversity of citizenship, and venue is proper according to 28 USC § 1391(a)(2) because a substantial part of the events giving rise to the claim occurred in Amarillo, Potter County, Texas.

## FACTUAL BACKGROUND

5.     On or about April 21, 2009, Plaintiff Gary Karrh purchased a Model 770 Remington bolt action rifle, serial number 71509329 from Gander Mountain Company (hereinafter referred to as the "Subject Rifle").  The gun was purchased for personal, family, or household use.  The Model 770 Remington bolt action rifle Plaintiff purchased contains a "Walker" fire control system.

6.     On October 31, 2010, Tucker Karrh, age 16, was cleaning the Subject Rifle when the gun discharged without pulling the trigger, sending a bullet through Tucker Karrh's lower lip, through the middle of his face, exiting through his forehead.

2

Tucker Karrh survived this incident but sustained horrific, life-threatening, and life-long debilitating injuries.

7.      Remington manufactured, marketed, and distributed the Subject Rifle, and its component parts, including its action, fire control system, and safety.  A picture of the Subject Rifle is included below:



8.      The Model 770 is a slightly revised version of the Model 710.  The Model 710 and the Model 700 are different rifles, but the both the Model 710 and the Model 770 share the same or very similar fire control with the Model 700.

9.      At the time of the incident, the Subject Rifle contained an unreasonably dangerous and defective fire control system that was known by Remington to fire without a trigger pull under various scenarios.  "Substantial evidence reveals that a portion of the trigger mechanism of these rifles, known as the "Walker fire control," is defective and can cause the rifle to fire without a trigger pull."  Order Granting Barber's Motion to Intervene (Dkt. 424; February 6, 2012), *Aleksich v. Remington*, 2:91-cv-00005-RFC (Dist. Montana).  Defendants have designed and incorporated a new trigger mechanism that is safe, and Remington now installs the new mechanism in all of its new consumer rifles.

10.     The Walker Fire Control System, which was the trigger mechanism included in the Subject Rifle, was patented and assigned to Remington Arms Company in

1948. Remington first heard complaints from the field in the 1940s regarding the Model 721-722 Rifle, the predecessor of the Model 700 that contained essentially the same fire control mechanism. The complaints centered on discharge upon safety release and also upon closing of the firing bolt.

11.     Remington explored the redesign of the trigger mechanism in both the 1940s and in the 1970s. Each time, it determined that comprehensive redesign was cost prohibitive. An internal Remington document from 1977 discussed problems with the Model 700. This information was not disseminated to the general public.

12.     A Remington memorandum from 1981 recommended redesign of the Model 700's fire control system (or trigger mechanism) for a price of 32 cents per gun. Remington, however, opted to continue with the unreasonably dangerous design. Remington described a redesign of the Model 700's existing fire control system in an internal memorandum in 1985. That redesign was not implemented.

13.     A Remington document from 1990 red-flagged the alarmingly large number of Model 700 Rifles being returned to the factory due to accidental discharges. A Remington document from 1993 indicated that Remington, were it to adopt a new design, would have to come up with a readily defensible reason for the departure from the previous design, implying that the company knew of, but did not want to publically admit, the existence of the defect.

14.     In 1995, Remington indicated that it desired to eliminate the "Fire on Safety Release" malfunction and touted a redesign. Yet, Remington questioned whether it made financial sense to implement the new design in an internal document also from 1995. Nonetheless, various internal Remington documents, dated well before the date of

the subject incident, clearly describe the defects that cause the unintended discharge events and explain the need to redesign the Model 700 fire control mechanism.

FIRST CAUSE OF ACTION AGAINST REMINGTON
(Strict Products Liability)

15.     Plaintiffs hereby incorporate by reference all above allegations as if fully set forth herein.   At all relevant times, Remington was engaged in the business of designing, manufacturing, assembling, testing, inspecting, distributing, and selling firearms, and in this regard, did design, manufacture, assemble, test, inspect, distribute, sell, and place into the stream of commerce the Subject Rifle, knowing and expecting that the rifle would be used by consumers, and around members of the general public in the State of Texas.

16.     On October 31, 2010, the Subject Rifle and its component parts, including the trigger mechanism, were being operated and used for the purpose and in the manner for which they were designed, manufactured, assembled, tested, inspected, serviced, distributed, sold and intended to be used, and in a manner foreseeable to Remington and for which adequate and safe instructions and warnings were required to be issued.

17.     Prior to and on October 31, 2010, including when the Subject Rifle left the control of Remington, the Subject Rifle and its component parts, including the trigger mechanism, was unreasonably dangerous, not suitable for its intended purpose, and unsafe by reason of Remington' defective design, manufacture, assembly, testing, inspection, service, distribution and sale of the Subject Rifle and its component parts, and because the Subject Rifle was sold and distributed without adequate instructions and/or warnings regarding its defective characteristics.

18.     Defects in the design, manufacture, assembly, instructions, manuals and warnings, testing, inspection, service, distribution and sale of the Subject Rifle and component parts, including but not limited to the Subject Rifle's propensity to fire without a trigger pull in instances including safety release and bolt closure, caused the Subject Rifle to fire without a trigger pull, resulting in injuries to Plaintiff. Plaintiffs had no knowledge of this defective condition and neither had reason to suspect that the Subject Rifle was unreasonably dangerous prior to the unexpected discharge. Remington, however, knew, or in the exercise of ordinary care should have known, of the Subject Rifle's propensity to unexpectedly discharge without pulling the trigger.

19.     By reason of the foregoing, Remington is strictly liable for the damages sustained by Plaintiffs.

20.     As a result of the injuries to Plaintiff, Plaintiffs have sustained damages and are entitled to recover all fair and just compensatory damages allowed by law, including past and future medical expenses, pain and suffering and mental anguish, and other damages.

## SECOND CAUSE OF ACTION AGAINST REMINGTON
### (Negligence)

21.     Plaintiffs hereby incorporate by reference all above allegations as if fully set forth herein. On and before October 31, 2010, Remington owed Plaintiffs a duty to exercise reasonable care in the design, manufacture, assembly, testing, inspection, servicing, distributing, sale and/or repair of the Subject Rifle and its component parts, including but not limited to the trigger mechanism. Remington further owed Plaintiffs a duty of care to warn of any condition regarding the Subject Rifle and its component parts that could and did render the Subject Rifle unsafe.

6

22.     The injuries to Plaintiffs and resulting damages were proximately caused by the negligence of Remington by and through their officers, agents, employees, servants and others under their employ and control, in that they breached its aforesaid duties by carelessly failing to properly design, manufacture, assemble, test, inspect, service, distribute and sell the Subject Rifle and its component parts, including but not limited to the trigger mechanism.  Remington further breached its duties by failing to detect, correct and/or warn or instruct about the dangerous and unsafe characteristics of the Subject Rifle.

23.     Specifically, Remington was negligent in one or more of the following respects:

a) In designing a fire control with a "trigger connector";
b) In designing a fire control with manufacturing tolerance build up;
c) In designing a fire control that failed to include preset engagement between the trigger connector and the sear;
d) In designing a fire control that was susceptible to the accumulation of debris, lubrication build up, and/or the accumulation of rust;
e) In designing a fire control that was susceptible to adjustment;
f) In designing a fire control that was susceptible to the presence of manufacturing burrs or debris;
g) In designing a fire control that will fire without a pull of the trigger;
h) In designing a fire control that will fire when the safety is shifted from the "safe" to the "fire" position;
i) In designing a fire control that will fire when the bolt is cycled;
j) In designing a fire control that will "jar off;"
k) In designing a fire control that uses improper materials, including "powdered metal" for the sear that are unusually susceptible to normal wear and tear;
l) In manufacturing a fire control that has burrs or manufacturing debris within the fire control;
m) In manufacturing a fire control without proper or adequate quality control procedures or checks;
n) In failing to warn users and handlers of the rifles of the potential for firings in the absence of a pull of the trigger;
o) In failing to warn users and handlers of the risks and hazards of improper maintenance of the rifle;
p) In failing to warn users and handlers of the risks and hazards of adjustment of the fire control;

q) In failing to inform or advise users and handlers of the proper procedures for maintenance of the rifle; and

r) In failing to inform or advise users and handlers of the proper procedures for adjustments to the fire control.

24.     By reason of the foregoing, Remington proximately caused the injuries to Plaintiffs.  As a result of the injuries to Plaintiffs, Plaintiffs have sustained damages and is entitled to recover all fair and just compensatory damages allowed by law, including past and future medical expenses, pain and suffering and mental anguish, and other damages and totaling in the aggregate amount in excess of $10,000,000.00.

THIRD CAUSE OF ACTION AGAINST REMINGTON
(Breach of Express Warranty)

25.     The preceding paragraphs of this petition are incorporated by reference as if fully set forth herein.

26.     Plaintiffs were issued an express warranty by Remington.  Specifically, Remington warranted that its guns "will be free from defects in material and workmanship."  Under its warranty, Remington agreed to repair and/or replace the warranted components during the period specified.  Yet, Remington knew that the Subject Rifle was defective at the time is was sold but Remington hid that fact from Plaintiffs.

27.     Remington breached its express warranty by providing Plaintiffs with a rifle containing defective fire controls and the refusing to recall the firearm containing this defective fire control, even after sufficient knowledge that there was a defect that could potentially cause an unintentional discharge of the firearm and impose serious harm, including possible death, upon any individual near the firearm.

28.     By virtue of its knowledge of the defects, demands from purchasers, and its experience with the purchasers of the rifles containing the defective "Walker"-based fire control who complained of the unintended discharge, Remington has received notice of the breach of the warranty.

29.     As a result of the foregoing, the Plaintiffs have suffered damages that were directly and proximately caused by the defects in Remington's rifles containing the "Walker"-based fire control.  Plaintiffs are entitled to damages in the aggregate amount in excess of $10,000,000.00.

## FOURTH CAUSE OF ACTION AGAINST REMINGTON
### (Breach of Implied Warranty)

30.     The preceding paragraphs of this petition are incorporated by reference as if fully set forth herein.

31.     Remington impliedly represented and warranted that its rifles were free of defects; of merchantable quality; and/or fit for their intended purpose.  Remington warranted it would provide Plaintiffs with firearms that were in proper working order and that were fit for their intended purposes.  This included the "Walker"-based fire control systems.  Remington is further obligated to inform its purchasers that the firearms containing the defective fire control system contain a defect, and to recall these firearms for the safety of the owners and those around him.

32.     Remington breached these representations and implied warranties because the defective "Walker"-based fire control system installed on the rifle purchased by Plaintiffs was defective and made the rifles unsafe for its users and those around him.

33.     By virtue of its knowledge of the defects, demands from purchasers, and its experience with purchasers of the rifles containing the "Walker"-based fire control

systems who complained of the defect in the rifles, Remington has received notice of the breach of implied warranties.

34.     As a result of the foregoing, the Plaintiffs have suffered damages there were directly and proximately caused by a rifle that contained a "Walker"-based fire control system.  Plaintiffs are entitled to damages in the aggregate amount in excess of $10,000,000.00.

## FIFTH CAUSE OF ACTION AGAINST REMINGTON
### (Punitive and/or Exemplary Damages)

35.     Plaintiffs hereby incorporate by reference all above allegations as if fully set forth herein.  Despite a defect that has been known to Remington for decades—a defect resulting in approximately 10,000 documented complaints of unintended discharge, many jury verdicts finding that the design is defective (including at least 2 findings of gross negligence on the part of Remington), and more than $20 million in settlements paid to injured consumers since 1993—millions of unsuspecting users hunt today with a rifle that will fire before the trigger is pulled.

36.     Remington redesigned its fire control mechanism, but perceived financial ruin prevents Remington from recalling millions of rifles it knows are defective.  This "profits over people" or "profits over safety" mentality is exactly the conduct that exemplary damages are designed to prevent.

37.     Over 100 injured individuals have sued or made claims against Remington over the same defective design, and several juries, including at least two federal court juries, have found Remington's fire control to be defective.  As early as January 25, 1990, an internal Remington memo reveals:

> "The number of Model 700 rifles being returned to the factory because of alleged accidental firing malfunctions is constantly increasing.   170 were returned to Product Service for examination in 1989 with various accidental firing complaints.   To date this year, 29 have been returned."

Ignoring thousands of customer complaints, however, Remington refuses to recall its rifles or warn its customers.

38.     Remington's Model 710, which uses the Walker fire control, was introduced in 2001.  Even though the 710 has only been on the market for about eight years, Remington has already received hundreds of complaints of unintended discharge, mirroring the complaint history of the Model 700.

39.     Remington's defective trigger mechanism uses an internal component called a "connector"—a design component not used by any other rifle manufacturer. The connector floats on top of the trigger body inside of the gun, but is not physically bound to the trigger in any way other than spring tension.  The connector cannot be seen or controlled by the gun handler.  When the trigger is pulled, the connector is pushed forward by the trigger, allowing the sear to fall and the rifle to fire.

40.     The proper position of the connector under the sear requires an overlap— or "engagement"—of only approximately 25/1000ths of an inch (half the width of a dime or eight human hairs).  But because the connector is not bound to the trigger, during the recoil action after each firing of the rifle, the connector separates from the trigger body several times and creates a gap between the two parts.  This separation is recorded in Remington's own high-speed video footage of the fire control during discharge.  Any dirt, debris or manufacturing scrap can then become lodged in the space created between the connector and the trigger, preventing the connector from returning to its original

position.

41.     Remington's own experts have admitted the existence of this dangerous

condition:

> Q.     From a performance standpoint, the trigger connector, by the time
> the Model 710 was introduced, did nothing to truly enhance
> performance.
>
> A.     I think that's true.
>
> Q.     Are there any circumstances, in your judgment or experience,
> depending upon, you know, again, what other factors may be at
> play, where the trigger connector does increase the risks or the
> safety concerns with use of the Walker fire-control system?
>
> A.     It theoretically adds one more point at which you could put in
> debris and prevent the connector from returning underneath the
> sear, and that is between the trigger and the connector.
>
> Q.     Let me see if I understand what you just said. On a theoretical
> level, the trigger connector does present a moving part that under
> certain circumstances could result in debris getting between the
> trigger connector and the trigger body, correct?
>
> A.     Right.

Deposition of Remington liability expert Seth Bredbury, *Williams v. Remington*.

42.     When enough displacement occurs, the connector will no longer support

the sear (either no engagement is present, or insufficient engagement is present) and the

rifle will fire without the trigger being pulled.  This can occur in a variety of ways

including when the safety is released, when the bolt is closed, or when the bolt is opened.

These unintended discharges occur so frequently that Remington actually created

acronyms for internal use (Fire on Safe Release—"FSR"; Fire on Bolt Closure—"FBC";

Fire on Bolt Opening—"FBO"; and Jar Off—"JO").   The various manifestations

notwithstanding, all of the unintended discharges result from the same defective

condition—the susceptibility of the connector to be displaced from its proper position. Even one of the designers believes housing of the fire control parts is incorrectly designed.

43.     When questioned about this susceptibility shown in Remington's own high-speed video footage, Remington engineer Michael Keeney offered the following:

Q.     In those frames, does the connector appear to be separated from the trigger body?

A.     Yes.

Q.     And if debris is inside the housing, that would provide an opportunity for debris to come between the connector and the trigger body; correct?

A.     That is correct.

Deposition of Remington engineer Michael Keeney, *Williams v. Remington.*

44.     Derek Watkins, another Remington engineer, explained that this defect could lead to a dangerous situation:

Q.     If the trigger doesn't return for whatever reason to full engagement. . . , that is not safe; would you agree with me? Because the gun is now more susceptible --

A.     It is more—it is more sensitive, yes; it is more sensitive.

Q.     It is more sensitive to forces that would jar the rifle in such a way for that engagement, basically, for the trigger no longer to be underneath the sear and the gun to discharge?

A.     Yes.

Deposition of former Remington engineer Derek Watkins, *Williams v. Remington.*

45.     James Ronkainen, another Remington engineer, also admits that failure of the connector to properly engage leads to a dangerous condition:

13

> Q.   One common factor in a fire on safe-release and a theoretical firing on bolt-closure is that the connector is not in its appropriate condition — position; correct?
>
> A.   Yes.  It is unable to support the sear.

Deposition of Remington engineer James Ronkainen, *Williams v. Remington.*

46.   This dangerous condition caused Remington to embark on redesign efforts many times in the 1980's and 1990's. The goal of these efforts was to eliminate the defect:

> Q.   The goal while you were there was to — is to achieve a design that did not result in a fire on safety-release; is that correct?
>
> A.   The design was to eliminate any type of-- any type of debris or any type of firing from that standpoint.  Fire on bolt-closure, yeah, we did-- we definitely did not want that to happen.

Deposition of former Remington engineer Derek Watkins, *Williams v. Remington.*

47.   When Remington again contemplated a recall of the Model 700 rifle (and similar firearms) in the mid-nineties, Kenneth D. Green, Manager of Technical & Consumer Services, drafted a forthright warning letter to owners of Remington rifles, which included the following language (emphasis in original):

> "<u>This safety notice is being sent to be sure you understand that if your Model 700, Model Seven or Model 40X rifle is loaded, the gun may accidentally fire when you move the safety from the "safe" position to the "fire" position, or when you close the bolt.</u>"

48.   Mr. Green sent the draft warning to Remington's Bob Lyman for approval.  Mr. Lyman did not approve the draft.  Instead, he wrote in the margin to the left of the above language, "Needs to be rewritten; too strong."  Mr. Lyman, likely speculating that the language would hurt sales or confirm Remington's knowledge of the defect, ensured that Remington's customers never received the warning.

49.     Remington's defective fire control also could have been redesigned to eliminate the harm or danger very inexpensively.  Several companies sell connector-less replacement triggers for the Model 700.  There is no valid engineering reason why the successfully utilized connector-less designs could not have been used by Remington in its Model 770.

50.     Remington has recently removed the connector for some of its Model 700, 710 and 770 rifles with a newly designed trigger mechanism, the X-Mark Pro.  That design was completed in 2002, before the incident in question.  This safer design would have prevented the injuries to Plaintiff.  But Remington chose to continue installing its prior design.  Even Remington's President and CEO, Thomas L. Millner, agreed in his 2007 deposition that the X-Mark Pro is a safer design (Question:  "Did [Remington] make a safer fire control with the X-Mark Pro?"  Answer:  "Yes, I believe so.").

51.     Not only did Mr. Millner admit that the design is safer, he admits that the new design prevents the rifle from firing upon release of the safety (Question:  "And this new design precludes [fire on safety release] from occurring, true?"  Answer:  "True.").  Finally, he admits that the old design does not have safety features precluding fire on safety release (Question:  "And that's the fire control that does not have the safety features that preclude the fire on safe release, true?"  Answer:  "That's correct.").  Simply put, Remington's new design would have prevented this accident, and Remington knew it.  But Remington did not take action to include the new fire control the rifle that injured Plaintiff or even warn of a known safety issue.

52.     Jury verdicts and appellate court opinions provide a succinct account of

Remington's long-standing knowledge of its defective fire control.   In *Lewy v. Remington,* the Eighth Circuit upheld a finding of punitive damages against Remington in 1985:

> We hold that there was sufficient evidence from which the jury could find that Remington knew the M700 was dangerous.  The following evidence was before the jury: complaints from customers and gunsmiths that the Model 700 would fire upon release of safety, some of these complaints dating back as far as the early 1970s (footnote text in opinion omitted); Remington's own internal documents show that complaints were received more than two years before the Lewy rifle was produced; Remington created a Product Safety Subcommittee to evaluate M700 complaints and on two occasions decided against recalling the M700; and Remington responded to every customer complaint with a form letter that stated that they were unable to duplicate the problem, that the customer must have inadvertently pulled the trigger and that Remington could not assume liability for the discharge.

> We believe that in viewing this evidence, and permissible inferences, in the light most favorable to the Lewys a jury could reasonably conclude that Remington was acting with conscious disregard for the safety of others.  Remington maintains that their actions in investigating and responding to customer complaints and in creating the Product Safety Subcommittee to study the customer complaints reflect their good faith and sincerity in dealing with the M700.  However, another permissible view to be drawn from all of this evidence may be that Remington was merely "gearing up" for a second round of litigation similar to the litigation involving the M600 which resulted in the ultimate recall of the M600.  Remington's Product Safety Subcommittee concluded that of approximately two million M700s held by the public about 20,000 of them may have a potential defect (footnote omitted).  A recall was not pursued because of the relatively small number of rifles that may have the defective condition. *See, e.g., Kehm v. Proctor & Gamble Mfg. Co.,* 724 F.2d 613, 620 (8th Cir.1983) ("[I]n determining whether a manufacturer has a duty to warn, courts inquire whether the manufacturer knew that there were even a relatively few persons who could not use its product without serious injury, and whether a proper warning would have helped prevent harm to them.").  Thus, the jury may have concluded that rather than suffer the expense of a recall, Remington would rather take their chances that the 20,000 potentially dangerous M700 rifles held by the public will not cause an accident.  Such a view, if true, would certainly establish that Remington acted with conscious disregard for the safety of others.

53.    On March 24, 1992, The United States Court of Appeals, Ninth Circuit, affirmed a jury verdict of $724,000 in a case alleging discharge on bolt closure. *Campbell v. Remington Arms Co.*, 1992 WL 54928, *2 (C.A. 9 (Alaska) 1992) (unpublished opinion).

54.    On December 31, 1992, the Texas Supreme Court, in *Chapa v. Garcia*, 848 S.W.2d 667, 671-74 (Tex. 1992), specifically describes Remington's fire control as "defective":

> Luis Chapa clearly established the relevance of and his need for the documents, by offering evidence demonstrating that the NBAR program had as its goal improvement of the defective fire control on the Model 700 and that Chapa faced a significant time gap in the record as to Remington's *knowledge* of the defect (footnote omitted).   Included in Chapa's showing was:
>
> > • a 1985 Remington memorandum describing the NBAR program as one to design a "replacement for the Model 700"
> >
> > • another Remington memorandum declaring that an improved fire control be installed in the Model 700 no later than October 1982 "to put us in a more secure position with respect to product liability"
> >
> > • a memorandum evidencing an increase of $130,000, in early 1981, in the research budget for development of an improved Model 700 fire control
> >
> > • proof of the abrupt discontinuation of further research into the fire-control system of the Model 700 after December 1981 coincident in time with the commencement of the NBAR program
> >
> > • deposition testimony that models of new, improved fire controls had been designed and assembled as part of NBAR, that prototypes had been built and tested, and that the NBAR fire controls could be retrofitted to the Model 700.

● Remington's admission that the fire control alternatives under consideration in the NBAR program and those it claims were geared solely to the Model 700 "attempt to execute the same *idea* (simultaneous blocking of the sear and trigger)" (footnote omitted).

● Remington's concession that the fire-control system research adopted the name "NBAR" in "late 1980 or 1981," about the time of the substantial increase in research funds for the Model 700 fire-control system.

● Remington's admission that "NBAR components which are or have been under consideration include a ... different fire control."

● Statements by Remington that NBAR information has relevance to the relative safety of its models compared to its competitors and the possible need for warnings.

55.    Then, on May 7, 1994, a Texas jury rendered a verdict after Glenn Collins lost his foot to a Model 700 accidental discharge (Fire on Safety Release allegation). Not only did the jury find that the fire control was defective, it also awarded $15,000,000 in exemplary damages. The total verdict, which was in excess of $17 million, sent a clear message to Remington—past and *certainly* future use of the defective fire control is unacceptable.

56.    It is difficult to ascertain exactly how many times Remington has embarked on designing a new Model 700 fire control. It clearly tried with the "NBAR" program, and it clearly tried on several occasions in the 1990's, and it clearly again tried beginning in approximately the year 2000.

57.    By 1995, Remington openly acknowledged the need to "fix" the fire control. As its documents show, it decided to "[e]liminate 'Fire on Safety Release' malfunction." Before work continued on a new fire control, however, Remington's Fire Control Business Contract (January 27, 1995) outlined the project and foreshadowed its

end:

> The goal is to provide a fire control that "feels" the same to our customers yet provides additional safeguards against **inadvertent or negligent discharges**.
>
> . . .
>
> The purpose of the redesign of the fire control is to reduce the number of parts required, lower cost and to add design characteristics that **enhance the safety attributes** of our firearms.

58. The next paragraph, however, laments that safety "is not considered a highly marketable feature." The next full paragraph in the document speaks for itself. Under "<u>Financial Analysis</u>," appears this telling quote:

> This is where the rubber meets the road. Is this project worth doing? What are the minimum forecasts to insure profitability and does our pricing structure support these expected profits?

59. The project to "enhance the safety attributes of our firearms" is only "worth doing" if Remington can "insure profitability." True to form, the M700 Improvements Program was cancelled on August 28, 1998.

60. Remington has repeatedly made a clear economic choice against recalling the Model 700. But the Model 710 was to be a new rifle. In 1997, and against this sordid and costly fifty-year historical backdrop, Remington faced an important but easily answered question regarding the new low cost bolt-action rifle it intended for beginner users: What fire control should Remington use?

61. When embarking on the design of the Model 710, Remington originally elected against the use of the Model 700 fire control, which contains the connector. Instead, Remington embarked on the design of a "connectorless" fire control.

62. Derek Watkins, a Remington Engineer, designed a connector-less fire

control based on the work performed during the cancelled M700 improvements program. Watkins touted the benefits of his new design within Remington.

63.     Once again, Remington had a new and safe design.  But the design was allegedly too expensive to implement, and project spending was put on hold in May 1998.  Even though Watkins design was favored within Remington, the engineering department could not get approval for the economics of the project.

64.     In August 1998, Watkins' safe design was abandoned due to an estimated cost increase.  Motivated once again by the prospect of saving money and increasing its profit margin, Remington decided to pull the unsafe Model 700 fire control off the shelf and use it in the new Model 710 to eliminate development cost and time.

65.     Remington is defiant in its reluctance to recall or stop using its fire control, a product that it knows is dangerous and that will kill or injury again, through no fault of the unsuspecting user.  The two or more "replacement campaigns" (recalls) contemplated by Remington were seen as too expensive.  Remington has elected to defend its product in court rather than embark on a recall that would likely save lives.

66.     No government agency can force Remington to recall its product, and Remington has made its internal customer service advisors aware of that fact.  It is only through the court system that Remington may be made to answer for its product.

67.     Remington has consistently elected against a recall of its dangerous product for financial reasons, even though it is has designed a new product that removes the problematic connector and eliminates the danger.  Even Remington's past President admits that the new design is safer.  This is improper, and Remington should recall all of its rifles containing a "Walker"-based fire control, including the Model 770 that caused

20

the grievous injuries in this case.  Until that time, Plaintiffs in this action seek punitive and/or exemplary damages against Remington for its willful acts of malice and gross negligence.

## BREACH OF EXPRESS WARRANTY AGAINST
## GANDER MOUNTAIN COMPANY

68.    The preceding paragraphs of this petition are incorporated by reference as if fully set forth herein.

69.    Plaintiffs were issued an express warranty by Gander Mountain. Specifically, Gander Mountain warranted that its guns "will be free from defects in material and workmanship."  Under its warranty, Gander Mountain agreed to repair and/or replace the warranted components during the period specified.  Yet, Gander Mountain knew that the Subject Rifles were defective at the time they were sold but Gander Mountain hid that fact from Plaintiff.

70.    Gander Mountain breached its express warranty by providing Plaintiffs with a rifle containing defective fire controls and the refusing to recall the firearm containing this defective fire control, even after sufficient knowledge that there was a defect that could potentially cause an unintentional discharge of the firearm and impose serious harm, including possible death, upon any individual near the firearm.

71.    By virtue of its knowledge of the defects, demands from purchasers, and its experience with the purchasers of the rifles containing the defective "Walker"-based fire control who complained of the unintended discharge, Remington has received notice of the breach of the warranty.

72.    As a result of the foregoing, the Plaintiffs have suffered damages that were directly and proximately caused by the defects in Gander Mountain's rifles containing the

"Walker"-based fire control.  Plaintiffs are entitled to damages in the aggregate amount in excess of $10,000,000.00

## SECOND CLAIM FOR RELIEF FOR BREACH OF
## IMPLIED WARRANTY AGAINST GANDER MOUNTAIN COMPANY

73.     The preceding paragraphs of this petition are incorporated by reference as if fully set forth herein.

74.     Gander Mountain impliedly represented and warranted that its rifles were free of defects; of merchantable quality; and/or fit for their intended purpose.  Gander Mountain warranted it would provide Plaintiffs with firearms that were in proper working order and that were fit for their intended purposes.  This included the "Walker"-based fire control systems.  Gander Mountain is further obligated to inform its purchasers that the firearms containing the defective fire control system contain a defect, and to recall these firearms for the safety of the owners and those around him.

75.     Gander Mountain breached these representations and implied warranties because the defective "Walker"-based fire control system installed on its rifle purchased by Plaintiff were defective and made the rifles unsafe for its users and those around him.

76.     By virtue of its knowledge of the defects, demands from purchasers, and its experience with purchasers of the rifles containing the "Walker"-based fire control systems who complained of the defect in the rifles, Gander Mountain has received notice of the breach of implied warranties.

77.     As a result of the foregoing, the Plaintiffs have suffered damages there were directly and proximately caused by a rifle that contained a "Walker"-based fire control system.  Plaintiffs are entitled to damages in the aggregate amount in excess of $10,000,000.00.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief, jointly and severally, against Remington:

    a)  For general damages to compensate Plaintiffs for their damages;

    b)  For the reasonable value of past and future medical expenses incurred for the accident-related care of Plaintiff;

    c)  For other general and special damages available under law;

    d)  For punitive damages against Defendant to punish and deter Defendant, and others similarly situated, from engaging in like conduct in the future;

    e)  For Plaintiffs' cost of suit;

    f)  For Plaintiffs' reasonable attorneys' fees as allowed by law; and

    g)  For such other and further relief as the Court deems just and proper.

Respectfully submitted,

**HANNA LAW FIRM, P.C.**
Jon Hanna
State Bar No. 08919200
302 Chestnut Street
Abilene, Texas  79602
325.673.6952 / 325.673.4496 - Fax

--- AND ---

**HIGHTOWER & ANGELLEY, LLP**
Jeffery Hightower
State Bar No. 00793951
4144 N. Central Expressway, St. 1230
Dallas, Texas 75204
214.580.9800/214. 214.580.9804 – Fax

---AND---

**ALLEN LAW FIRM**
Post Office Box 700
Abilene, Texas 79604
325.437.2424 / 325.437.3837 – Fax

By: _____
      **GREG ALLEN**
      State Bar No. 01033350
**ATTORNEYS FOR PLAINTIFFS**